Louis Horowitz v. Commissioner.
Horowitz v. Commissioner
Docket No. 7361.
United States Tax Court
1946 Tax Ct. Memo LEXIS 190; 5 T.C.M. (CCH) 375; T.C.M. (RIA) 46113; May 21, 1946
George Lewis, Esq., for the petitioner. Thomas R. Charshee, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in petitioner's income tax for the calendar year 1941 in the amount of $4,279.52. In a statement attached *191 to the deficiency notice, respondent explained his determination as follows: It is held that the gains realized through the exchange of 160 shares of the capital stock of the National Waistband Company Inc. and 30 shares of the capital stock of H.W.E. Realty Company of Brooklyn, N. Y., Inc., in the respective amounts of $16,000.00 and $5,000.00, are taxable 100 per cent as partial liquidating distributions under Section 115(c) and (i) of the Internal Revenue Code. Findings of Fact The facts have been presented to the Court by stipulation, documentary evidence and oral testimony. The facts stipulated are found to be as stipulated. Petitioner is an individual residing in Forest Hills, Flushing, New York. His income tax return for the calendar year 1941 was filed with the collector of internal revenue for the first district of New York. On December 1, 1941, petitioner received, as a gift from each of his two uncles, Julius Schwartz, and Jacob Schwartz, 80 shares of stock of the National Waistband Co. Inc., (hereinafter referred to as "National"), and 15 shares of stock of the H.W.E. Realty Co., Inc., Brooklyn, New York, (hereinafter referred to as "Realty"). Petitioner thus *192 received 160 shares of National and 30 shares of Realty stock on that date. Gift tax returns were duly filed by the two donors. The cost of the National stock to each of the donors was $2,000, and the cost of the Realty stock to each donor was $1,500. National was originally incorporated in 1914 under the laws of the State of New Jersey under the corporate name "The National Waistband Company, Inc.", with an authorized capital stock in the sum of $200,000, consisting of 2,000 shares of the par value of $100 each. Prior to 1920 all of the authorized stock of the New Jersey Corporation was outstanding, the entire amount being held by five shareholders. In 1920, the corporation acquired 400 shares from all of its shareholders pro rata, in 1927 it acquired 320 shares from an individual shareholder, and in 1930 it acquired 320 shares from another shareholder, the 1927 and 1930 acquisitions being the entire amounts held by the respective shareholders from whom acquired. In June 1929, Samuel Horowitz, father of the petitioner, gave 500 of his 800 shares to Harry Horowitz, brother of the petitioner. In May 1935 the New Jersey Corporation had 960 shares outstanding, held as follows: Samuel Horowitz
300 shares
Harry Horowitz
500 shares
Julius Schwartz
80 shares
Jacob Schwartz
80 shares
*193 the latter two shareholders being uncles of the petitioner. In May 1935 a new corporation with the name of National Waistband Co. Inc. was incorporated under the laws of the State of New York with an authorized capital of $100,000, consisting of 1,000 shares of capital stock of a par value of $100 each. Each one of the shareholders of the New Jersey corporation exchanged his shares in that corporation for shares in the new company, National, share for share. There was no further change in the shareholders of National prior to December 1, 1941. Realty was incorporated in February 1920, under the laws of the State of New York with an authorized capital of $16,000, consisting of 160 shares of $100 par value each. Within a few weeks after incorporation, its authorized capital stock was increased to $50,000, consisting of 500 shares of a par value of $100 each. In 1927, 300 shares of its stock were outstanding. During 1927, Realty acquired 60 shares of its outstanding stock, and in 1930 it acquired another 60 shares. After these acquisitions, and until December 1, 1941, Realty's outstanding stock was held as follows: Samuel Horowitz
150 shares
Julius Schwartz
15 shares
Jacob Schwartz
15 shares
*194 After the petitioner received the gifts of National stock on December 1, 1941, the outstanding stock of National amounted to 960 shares, of which petitioner's father had 300 shares, petitioner's brother 500 shares, and the petitioner 160 shares. After petitioner received the Realty stock from his two uncles, all of that company's outstanding stock was held by petitioner's father, who had 150 shares, and by the petitioner, who had 30 shares. Petitioner was associated with both National and the Realty Co. from about 1925 on. He managed National's business, built labor-saving machines for it, repaired its machinery and bought and sold merchandise for it. He also did repair work for Realty, collected rent for it, and did whatever else was necessary in the conduct of its business. Petitioner was unusually skilled in building and repairing machinery used by National in its operations, and had developed for it some patented machinery which no one else knew how to repair. Shortly after the United States entered the war on December 7, 1941 petitioner thought that he might be drafted into the Armed Forces, or that he would have to get into war work in some capacity. In order to establish *195 some financial security for his family during his period of war service, petitioner decided to dispose of his National and Realty stock. Petitioner discussed the matter in December 1941 with his brother, who was secretary-treasurer of both corporations at the time, and with his father. The father and the brother were directors of both corporations. Petitioner proposed that both corporations purchase his stock. The father was reluctant to lose petitioner's services to the companies, but, after petitioner agreed to return to the companies at the end of the war, and to perform such services for the companies as might be necessary, and possible, during his period of war service, the father agreed to the acquisition of petitioner's stock by each of the companies. On December 30, 1941, National acquired from the petitioner the 160 shares of its capital stock which he held and gave the petitioner the sum of $20,000 therefor. On the same day, petitioner received $8,000 from Realty in exchange for his 30 shares of its stock. The 160 shares of National stock were evidenced by two certificates for 80 shares each, while the 30 shares of Realty were evidenced by two certificates for 15 shares *196 each. No Federal and state transfer stamps were affixed to either the National or Realty Co. stock certificates at the time of the transfers. Neither corporation filed a certificate of reduction of stock with the Secretary of State for New York. On February 24, 1942, the board of directors and the stockholders of National, consisting of petitioner's father and brother, held a special combined meeting at which the two directors and stockholders "reported the payment of a check for $20,000 to Louis Horowitz [petitioner] in full payment for 160 shares of the stock of this corporation." Petitioner was elected as a director of National at this same meeting. On the same day, February 24, 1942, the board of directors, consisting of petitioner's father and brother, and the sole stockholder, petitioner's father, of Realty held a similar special combined meeting at which petitioner was elected as a director of the corporation and the two directors "reported the payment of check for $8,000 to Louis Horowitz [petitioner] in full payment for 30 shares of the stock of this corporation." Prior to the special meeting of February 24, 1942, the directors and stockholders of National had *197 signed a waiver of notice of the meeting which stated, inter alia, that a purpose of the meeting was "to ratify the purchase of 160 shares of its own capital stock from Louis Horowitz". A similar waiver had been signed by the directors and stockholders of Realty which provided that a purpose of the meeting was "to ratify the purchase of 30 shares of its own capital stock from Louis Horowitz." At some unspecified time after these stock certificates were received by the respective companies, the word "cancel" was written in the margin of each certificate. This was done at suggestion of the accountant for both companies because he considered "it is customary, when a certificate is turned in, so far as that certificate is concerned it should be marked cancelled." The question of whether the stock represented by the certificates should be cancelled or redeemed was not considered by the officers or directors of either company at the time of its acquisition. Upon the books of both corporations, the accountant debited the common stock unissued accounts with the par value of the stocks, debited the surplus accounts with the excess paid over par, and credited the cash accounts with the total *198 amount paid to petitioner. The accountant's practice was to enter in the debit column of the common stock unissued account both stock originally unissued and stock which was not outstanding. The 1920, 1927 and 1930 stock acquisitions of the New Jersay corporation and the 1927 and 1930 stock acquisitions of Realty apparently were treated in the same fashion on the books of the respective companies. The balance sheet of National as of December 31, 1941, attached to its income and declared value excess-profits tax return for the calendar year 1941, shows that the company's capital stock was $96,000 at the beginning of the taxable year, and $80,000 at the end of that year, a reduction in the exact amount of the par value of the stock acquired from petitioner. In Schedule M, reconciliation of net income and analysis of earned surplus and undivided profits, of this return, line 10 reads as follows: 10. Sundry debits to earned surplus
(itemize)
(a) Premium on 160 shares
4,000.00
(b) (Acquired and cancelled)
The balance sheet of the Realty Co. attached to its income tax return for the fiscal year ended July 31, 1942, states that its capital stock was $18,000 at the *199 beginning of the taxable year and $15,000 at the end, a reduction in the exact amount of the par value of the stock acquired from petitioner. Line 8 of Schedule M of this return, reads: 8. Other unallowable deductions: (a) Premium on 30 shares ac-
quired (12/30/1941)
5,000.00
The net profit of Realty was $781.97 for the fiscal year ended July 31, 1942, and $1,602.94 for the fiscal year ended July 31, 1943. National had a net profit of $1,674.30 in the calendar year 1941 and $4,486.57 in 1942. In the spring of 1942, petitioner was employed as chief engineer by an industrial concern engaged in war work. While so employed petitioner from time to time assisted National and Realty by repairing machinery and determining prices of merchandise for sale. At the time of the hearing of this case petitioner had returned to National and Realty, and was managing both companies. He was also at that time the owner of 100 shares of National stock which had been given to him by his brother in September 1945. Opinion KERN, Judge: The question at issue is whether the payments by the two companies to petitioner in 1941 constituted distributions in partial liquidation, under *200 the provisions of section 115 (c)and11 (i) of the Internal Revenue Code, in effect during the taxable year. The respondent contends that the circumstances under which the two companies acquired their own stock constituted a cancellation or redemption thereof, which comes within the provisions of section 115 (c) of the Code, with the result that the gains realized by the petitioner are 100 percent taxable. Petitioner, on the other hand, contends that the amounts which he received in 1941 were not distributions in partial liquidation, but were simply considerations received for the sale of capital assets. Section 115 (c) of the Internal Revenue Code provides that amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for stock, and that the gain so recognized shall be considered as a short-term capital gain. Section 115 (i) defines "amounts distributed in partial liquidation" as a distribution by a corporation in complete cancellation or redemption of a part of its stock. [1] Short-term capital gains are taxable 100 percent under section 117 of the Code (applicable to the calendar *201 year 1941). Section 19.115-5(c) of Regulations 103 provides, in part, that "a complete cancellation or redemption of a part of the corporate stock may be accomplished, for example, * * * by the complete retirement of any part of the stock, whether or not pro rata among the shareholders." *202 Whether the transactions here constituted distributions in partial liquidation is entirely factual. William A. Smith, 38 B.T.A. 317. The controlling factor in determining whether a partial distribution has taken place is the intent of the corporation in reacquiring its stock. If the stock is acquired by the corporation and at the time of acquisition the corporation intends that it be canceled and retired, the seller receives a distribution in partial liquidation; and the fact that he may not know it was purchased with this intention, is immaterial. George F. Jones, 4 T.C. 854, 857. Some of the circumstances surrounding the transactions here in question tend to support respondent's contention that there was, in effect, a distribution by each corporation to petitioner which was "in complete cancellation or redemption of a part of its stock". Other circumstances support petitioner's contention that the corporations at the time they acquired the stock from petitioner did not intend its complete cancellation or redemption within the meaning of the statute. Broadly speaking, the bookkeeping entries made subsequent to the acquisition of the stock tend to support *203 the respondent, while the form of the acquisition and the subsequent formal acts of the corporation tend to support the petitioner. Disregarding the conflicting circumstantial evidence, certain facts are unmistakably clear. The corporations are family corporations informally conducted. Neither of them had failing businesses or intended to go out of business. Their purchases of the stock in question were proposed not by them but by petitioner stockholder who wished to sell his stock for personal and compelling reasons. It was natural that he should try to sell the stock either to members of his family or to the family controlled corporations. If he intended to sell his stock it was natural that the corporations should buy it rather than permit it to be sold to persons not members of the Horowitz family. The testimony of a director of each corporation is categorically to the effect that there was no intent on the part of the officers and directors that petitioner's stock be canceled or redeemed. No fact in the record shows a dissolution, in whole or in part, of the business of either corporation, or indicates any reason for either corporation at the time of the transactions in question *204 to intend a partial liquidation. From all the evidence we conclude that at the time the corporations acquired the stock in question from petitioner, they had no intention that t there should be a cancellation or redemption of it within the meaning of the applicable provision of the Internal Revenue Code. As we view the facts the corporations at that time merely intended to purchase the stock from petitioner and had made no determination as to what they would do with the stock when purchased. See Harold F. Hadley, 1 T.C. 496. Any determination made after the acquisition of the stock by the corporations would be immaterial. See Alpers v. Commissioner, 126 Fed. (2d) 58. Decision will be entered for the petitioner. Footnotes
1. SEC. 115. Distributions by Corporations. (c) Distributions in Liquidation. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation * * *. (i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩